USDC SCAN INDEX SHEET

















CAG    2/10/04    13:37

3:01-CV-01742   CALIFORNIA NATIVE V. NORTON

*78*

*O.*

FILED

04 FEB 10 AM 8: 59

CLERK, U S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA NATIVE PLANT SOCIETY,<br><br>                         Plaintiff,<br><br>vs.<br><br>GALE NORTON, Secretary, Department of the Interior, et. al.,<br><br>                         Defendants. | CASE NO. 01cv1742 DMS (JMA)<br><br>**ORDER (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND (2) GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. Nos. 50 and 60] |

Plaintiff California Native Plant Society ("Plaintiff") brings this civil action pursuant to 16 U.S.C. § 1540(g). Plaintiff alleges one count in its Third Amended Complaint, namely that Defendants have violated sections 7(a)(2) and 7(a)(4) of the Endangered Species Act, 16 U.S.C. §§ 1531-1544. Plaintiff names Gale Norton, Secretary, Department of the Interior, Marshall Stevens, Director of the United States Fish and Wildlife Service, and the City of San Diego as Defendants in this case.

## I.

## PROCEDURAL BACKGROUND

Plaintiff filed its original complaint in this case on September 26, 2001. On December 4, 2001, the Federal Defendants filed a motion to dismiss Plaintiff's first claim for relief,

which the Court granted on April 10, 2002. On May 6, 2002, Plaintiff filed its First Amended Complaint, and on July 24, 2002, filed its Second Amended Complaint. Plaintiff stipulated to settle or dismiss five of its claims from prior complaints in June 2003. On June 2, 2003, Plaintiff filed its Third Amended Complaint ("TAC"). Although Plaintiff names the City of San Diego as a Defendant in the TAC, its sole claim for relief is directed at the Federal Defendants.

Plaintiff filed its instant motion for summary judgment on June 23, 2003. The Federal Defendants filed their cross-motions for summary judgment on July 14, 2003. On the same day, intervenor Aspen Creek joined the Federal Defendants' motion.[1] The parties' motions were originally scheduled to be heard on August 25, 2003.

On October 15, 2003, this case was transferred from the calendar of the Honorable Irma E. Gonzalez to the calendar of the Honorable Dana M. Sabraw. On February 6, 2004, the Court heard oral argument on the motions. Craig Sherman, Esq. appeared on behalf of Plaintiff. Keith Rizzardi, Esq. appeared on behalf of the Federal Defendants, and William Halle appeared on behalf of the intervenor.

## II.

## LEGAL BACKGROUND

In 1973, Congress enacted the Endangered Species Act ("the Act"), 16 U.S.C. § 1531 et seq., "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

Under section 4 of the Act, the Secretary of Interior must determine whether a species qualifies for protection as an endangered or threatened species. 16 U.S.C. § 1533(a)(1). Whereas endangered species are at risk of extinction, id. at § 1532(6), threatened species are "likely to become endangered species within the foreseeable future." Id. at § 1532(20). Once

///

---

[1] Aspen Creek owns and is reviewing plans to develop the 57.8-acre Carroll Canyon Business Park project ("the Project").

2

the Secretary lists a species under section 4, it falls within the Act's substantive protections under sections 7 and 9.

Pursuant to section 7(a)(2), 16 U.S.C. § 1536(a)(2), each federal agency must ensure through consultation with the United States Fish and Wildlife Service ("the Service") that any action authorized, funded, or executed by that agency is not likely to jeopardize the continued existence of any listed species; in other words, the action must not reasonably be expected to reduce appreciably the likelihood of survival and recovery of the species in the wild. 50 C.F.R. § 402.02. Consultation with the Service is either "formal" or "informal." Id. at §§ 402.13, 402.14. Formal consultation requires the Service to issue a biological opinion ("BiOp") advising the agency if jeopardy is likely and, if so, whether a reasonable and prudent alternative exists. 16 U.S.C. § 1536(b)(3)(A).

Essential elements of a BiOp include an evaluation of the current status of the species, the effects of the action, and cumulative effects upon the species, and the Service's opinion on whether the action is likely to jeopardize the species' continued existence. 50 C.F.R. § 402.14. The Service must base its BiOp on the best scientific and commercial data available. Id. at § 402.14(d). If a BiOp makes a "no jeopardy" determination, the Service issues an "incidental take statement" ("ITS") evaluating the effects of the proposed action on listed animal species. 16 U.S.C. § 1536(b)(4). The Act, however, does not prohibit take of plant species; plant species, therefore, are not included in an ITS. See id. at § 1536(o)(2); 50 C.F.R. § 402.14(i)(5); 16 U.S.C. § 1538(a)(2).

Under section 10 of the Act, a non-federal applicant may obtain an incidental take permit ("ITP").[2] To obtain an ITP an applicant must submit a Habitat Conservation Plan ("HCP") that specifies impacts to the species, steps to minimize and mitigate impacts, an analysis of alternative actions, and other measures as necessary or appropriate. 16 U.S.C. § 1539(a)(2)(A). Once the Service receives a complete application, it publishes a notice in the

---

[2]Congress established the section 10 permit process in 1982 to allow private landowners to pursue lawful activities on private property without risking criminal and civil penalties under section 9, and to encourage partnerships between public and private sectors and among governmental agencies in the interest of species habitat conservation. See H.R. Rep. No. 97-567 at 30-32 (1982).

01cv1742

Federal Register to allow for public comment on whether the permit should issue. Id. at § 1539(a)(2)(B); 50 C.F.R. §§ 17.22(b)(1); 17.32(b)(1). The Service shall issue an ITP if it finds: (1) the taking will be incidental; (2) the applicant will minimize and mitigate the impacts of the take to the maximum extent practicable; (3) the applicant ensures adequate funding of the plan; (4) the plan will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (5) such other measures required by the Service to be included in the HCP will be met. 16 U.S.C. § 1539(a)(2)(B); 50 C.F.R. § 17.22(b).

Under section 7 of the Act, the Service cannot issue a section 10 permit if would result in jeopardy to listed plant species; issuance of a section 10 permit by the Service is a federal action subject to internal consultation under section 7. To ensure that an ITP will not jeopardize a listed plant species, and to promote conservation of listed and unlisted plant species, the Service encourages section 10 permit applicants to include conservation measures for plant species in their HCPs. If the Service determines that plant species are "adequately covered" by the HCP, the species are often included on the section 10 permit in recognition of the conservation benefits provided by the HCP. See 50 C.F.R. 17.3 (defining "adequately covered"). As "covered species," both listed and unlisted plant species receive certain assurances under the Service's "No Surprises Policy" or "No Surprises" rule. 50 C.F.R. §§ 17.22(b)(5), 17.32(b)(5). Pursuant to 50 C.F.R. § 402.16, reinitiation of a section 7 consultation is required when a federal agency retains discretionary involvement or control over an action originally consulted on and (1) the extent of the take authorized under the ITS is exceeded; (2) new information reveals impacts to listed species or critical habitat not considered in the original BiOp; (3) the action is modified in a manner that causes effects to the listed species or critical habitat that were not previously considered; or (4) a new species is listed that may be affected by the action.

Pursuant to the Administrative Procedure Act, citizen suits may seek review of whether the Service's issuance of a BiOp or other action under the Act is arbitrary or capricious or otherwise not in accordance with the law. 5 U.S.C. § 706; Bennett v. Spear, 520 U.S. 154 (1997).

## III.

## FACTUAL BACKGROUND

Willowy monardella is a type of herb that grows in sandy or cobbly washes and waterways in San Diego County. A large population of Willowy monardella grows in the Carroll Canyon area of San Diego.

In August of 1996, the Defendants enacted the San Diego Multiple Species Conservation Program ("the San Diego MSCP"). The San Diego MSCP is an habitat conservation plan that was implemented to: (1) protect certain endangered and threatened species in San Diego, including the Willowy monardella; (2) provide an efficient process for authorizing "incidental takes" of certain protected species and habitats that are not endangered or threatened; and (3) foster a partnership among federal, state and local governments to facilitate a predictable permitting process for land development projects. The San Diego MSCP and Subarea Plan "were part of the City of San Diego's application for an Incidental Take Permit . . . ." (Federal Defs.' Statement of Facts at 1.)

On July 18, 1997, the Federal Defendants issued the Incidental Take Permit to the City of San Diego. This Permit allowed the City to facilitate the development-related loss of a certain quantity of Willowy monardella plants and habitat, provided that the City conserve 100 percent of all "major populations" of the species. In issuing this permit, the Federal Defendants relied largely or wholly on a BiOp issued by the Federal Defendants on June 6, 1997.

The June 6, 1997 BiOp discussed the likelihood that Willowy monardella plants would survive under the San Diego MSCP. The BiOp concluded that the Willowy monardella plants were adequately conserved, meaning that the Willowy monardella did not appear to face a reduced likelihood of survival under the San Diego MSCP. Specifically, the Federal Defendants found that 100 percent of the Willowy monardella populations would be conserved under the San Diego MSCP, and that the Willowy monardella would receive additional protections based on the species' association with, and dependence on, protected wetland

///

5

areas. On the basis of this BiOp, the Federal Defendants adopted a "no jeopardy" stance with regard to the Willowy monardella.

Between July 18, 1997 and October 13, 1998, the Willowy monardella apparently experienced increasing threats to its survival. On October 13, 1998, the Federal Defendants became aware that Willowy monardella was likely to become extinct within the foreseeable future. Accordingly, on that date, the Federal Defendants placed the Willowy monardella on the endangered species list. The Federal Defendants listed the Willowy monardella after determining that the regulatory controls for ensuring survival of the species were inadequate.

After Willowy monardella was placed on the endangered species list, the Federal Defendants updated the June 6, 1997 BiOp. In the updated BiOp, the Federal Defendants confirmed that the San Diego MSCP and the Incidental Take Permit would not jeopardize the continued existence of the Willowy monardella. However, the Federal Defendants "indicated that new information about the taxonomic status of certain populations of the species could trigger a need to reinitiate consultation in the future." (Id. at 2.)

Since approximately December 12, 2000, the City of San Diego has facilitated a development project on a 57.8-acre parcel of land in Carroll Canyon. This land is within the San Diego MSCP and was identified as home to 122 individuals of Willowy monardella. Aspen Creek owns this land and is processing plans to develop a business park on the land. The Army Corps of Engineers ("the Corps") asserted jurisdiction over a portion of the land pursuant to the Clean Water Act. Therefore, Aspen Creek applied to the Corps for a permit under section 404 of the Clean Water Act. As a result of the application, the Federal Defendants issued a new BiOp regarding the Willowy monardella. That BiOp concludes:

> the proposed permit is not likely to jeopardize the continued existence of willowy monardella because of: (1) the protection of the majority of the species based on the Marine Corps' natural resource management plans for Miramar; (2) the lack of evidence of species decline; (3) the questionable viability of the Carroll Canyon population; (4) the benefits of the proposed action's transplantation program; and (5) the proposed action's contribution toward genetic studies of the species.

///

///

6

01cv1742

(Id. at 4.) In accordance with this BiOp, Aspen Creek translocated all 122 individuals of Willowy monardella in Carroll Canyon. Plaintiff contends the 2003 BiOp violates sections 7(a)(2) and 7(a)(4) of the Endangered Species Act.

**IV.**

**LEGAL STANDARD**

The Administrative Procedure Act ("APA") governs judicial review of administrative actions based on the Endangered Species Act. See, e.g., Pyramid Lake Paiute Tribe v. United States Dep't of Navy, 898 F.2d 1410, 1413 (9th Cir. 1990). The APA modifies the usual summary judgment standard. The APA specifies that a court may overturn an agency action only where it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Ctr. for Biological Diversity v. Veneman, 335 F.3d 849, 853 (9th Cir. 2003).

Under the arbitrary and capricious standard, "administrative action is upheld if the agency has 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 982 (9th Cir. 1985) (quoting Baltimore Gas & Electric Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87 (1983)). The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." See, e.g., Indep. Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000). The scope of review under the arbitrary and capricious standard is narrow, and a court may not substitute its judgment for that of the agency. See, e.g., United States Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001).

In applying the arbitrary and capricious standard, the court must determine whether the agency articulated a rational connection between the facts found and the choice made. See, e.g., Public Citizen v. Dep't of Transp., 316 F.3d 1002, 1020 (9th Cir. 2003), cert. granted ___ U.S. ___, 124 S.Ct. 957 (2003). The court must consider whether the agency based its decision on a reasoned evaluation of the relevant factors. See, e.g., Price Road Neighborhood Ass'n v. United States Dep't of Transp., 113 F.3d 1505, 1511 (9th Cir. 1997). A court will overturn

7

an agency's decision only if the agency committed a "clear error of judgment." Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 666 (9th Cir. 1998).

Courts generally defer to an agency's interpretation of a statutory provision or regulation it is charged with administering. See, e.g., Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1175 (9th Cir. 2002) (noting deference given unless agency's interpretation is contrary to clear congressional intent or frustrates the policy Congress sought to implement); Webber v. Crabtree, 158 F.3d 460, 461 (9th Cir. 1998) ("Although we accord a high degree of deference to an agency's interpretation of its own regulation, that interpretation cannot be upheld if it is plainly erroneous or inconsistent with the regulation.").

In a proceeding based on the APA, 5 U.S.C. § 706, the district court's function in deciding a motion for summary judgment is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769-70 (9th Cir. 1985). In APA cases, de novo fact finding by the district court is only allowed in limited circumstances, since the administrative agency is the finder of fact. Id. Thus, the district court determines whether the agency could reasonably have found the facts as it did. Id.

## V.

## DISCUSSION

The parties disagree about whether the 2003 BiOp complies with the Act. Plaintiff points to six examples in the BiOp to support its position that the Federal Defendants' actions were arbitrary and capricious: (1) The Defendants' failure to define "major population," (2) the Defendants' failure to use the best available science, (3) Defendants' reliance on the efforts to conserve the population of Willowy monardella located on the military base at Miramar, (4) Defendants' assumption of no-net-loss due to wetland association and dependence, (5) Defendants' accounting methods, or lack thereof, and (6) Defendants' refusal to conduct a cumulative effects analysis. Defendants disagree that they violated the Act, and also argue Plaintiff's claims are moot.

///

## A.    Mootness

Defendants' first contention is that the case is moot because there are no Willowy monardella remaining in Carroll Canyon and there is, therefore, no relief which the Court can grant. The Court finds the instant case is not moot because effective relief is available.

A case becomes moot when it "loses its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law." Cantrell v. City of Long Beach, 241 F.3d 674, 678 (9th Cir. 2001)(quoting Hall v. Beals, 396 U.S. 45, 48 (1969)). Under Ninth Circuit case law the completion of an activity is not the hallmark of mootness. See, e.g., Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1065 (9th Cir. 2002). A case is moot "only where no effective relief for the alleged violation can be given." Id. (citing Cantrell, 241 F.3d at 678; Northwest Envtl. Def. Ctr. v. Gordon, 849 F.2d 1241, 1244-45 (9th Cir. 1988)). The Ninth Circuit has expressed concern that if the completion of the action challenged were sufficient to render the case nonjusticiable, entities could ignore environmental regulations, destroy the land or species at issue before the case gets to court, and then hide behind the mootness doctrine. See, e.g., Cantrell, 241 F.3d at 678 (citing West v. Sec'y of the Dep't of Transp., 206 F.3d 920, 925 (9th Cir. 2000)). Accordingly, defendants in environmental cases face "a particularly heavy burden in establishing mootness." Id.

In Cantrell, 241 F.3d 674, plaintiffs challenged the sufficiency of an environmental impact statement ("EIS") written in response to a plan to develop a former naval station. By the time the appeal reached the Ninth Circuit, several of the historic buildings and bird habitats at issue in the case had been razed. Nonetheless, the Ninth Circuit held that because effective relief was still available, the destruction of the buildings did not render the case moot. Id. at 678-79. The Ninth Circuit reasoned that mitigation of damage was possible. See also Gordon, 849 F.2d at 1245 (finding that the close of the 1986 fishing season–the regulations of which were at issue in the case–did not render the case moot since the damage caused by the 1986 regulations could still be mitigated, not by restoring fish harvested in 1986, but by allowing more fish to spawn in 1989).

Likewise, in <u>Neighbors of Cuddy Mountain</u>, 303 F.3d 1059, the Ninth Circuit declined to find the case moot just because logging of the bird habitat area at issue in the case had already occurred. <u>Id</u>. at 1065-66. The <u>Neighbors</u> court reasoned that remedies remained available even though the logged trees could not be brought back; other measures could mitigate the damage. <u>Id</u>. at 1066. The Ninth Circuit suggested that alternative remedies included (1) ordering the Forest Service to study the sale's impacts on species viability and, if needed, to mitigate those impacts in the area of the sale and elsewhere; and (2) a more direct species intervention, such as monitoring trends in the birds' population and developing, if necessary, artificial habitats for their recovery. <u>Id</u>.

In <u>Neighbors</u>, the Ninth Circuit distinguished <u>Headwaters, Inc. v. Bureau of Land Mgmt.</u>, 893 F.2d 1012 (9th Cir. 1990), where the court ruled that the logging of the trees at issue rendered the case moot. In <u>Headwaters</u>, in contrast to <u>Neighbors</u>, the plaintiffs filed a "narrowly-drawn" complaint seeking only to prevent defendants from logging three units of a 16-unit sale. <u>Headwaters</u>, 893 F.2d at 1014 n.5. The <u>Headwaters</u> panel, however, distinguished cases in which a plaintiff had made a "broad request for such other relief as the court deemed appropriate" and noted that courts may construe such requests for relief broadly to avoid mootness. <u>Id</u>. at 1015 n.6.

Here, although there are no remaining Willowy monardella in Carroll Canyon, other relief is possible and the case, therefore, is not moot. Unlike the complaint in <u>Headwaters</u> and similar to the complaint in <u>Neighbors</u>, Plaintiff's complaint requests <u>inter alia</u> "such other and further relief as this Court may deem just and proper."[3] Pursuant to Ninth Circuit case law, the

---

[3]The prayer for relief in plaintiff's TAC specifically requests the Court:

1.    Enjoin activities of all defendants, and as necessary enjoin third parties pursuant to the "All Writs Act," 28 U.S.C. 1651, from destroying or impacting any populations of Willowy monardella until lawful compliance with the ESA and AOA is achieved as alleged herein;

2.    Declare that the Defendants' determination of "no jeopardy" to the species in the Army Corps Biological Opinion and/or Biological Opinion for the MSCP are arbitrary and capricious, constitute and abuse of discretion and/or are not otherwise in accordance with law;

Court construes this request for relief broadly to avoid mootness. The Court finds that alternative remedies include (1) more direct species population intervention; (2) more direct studies and monitoring so that jeopardy will be avoided; (3) mitigating the impact to the Carroll Canyon population and elsewhere where the populations are diminishing or are threatened; and (4) ordering the Service to reevaluate or modify long-term conservation requirements under the current MSCP plan and future take of the Willowy monardella. Moreover, the Court could order the overturning and remanding of the BiOp for consideration consistent with the Court's rulings. Accordingly, the Court finds this case is not moot.

### B.    Failure to Use Consistent Definition of "Major Population"

Plaintiff's first argument is twofold: It asserts the lack of a consistent definition of "major population" renders the 2003 BiOp arbitrary and capricious. (Pl.'s P. & A. in Supp. of Mot. for Summ. J. at 11-14.) It also claims the lack of a consistent definition led to a failure to provide an adequate incidental take statement in violation of the rules and requirements for biological opinions. (Id.)

Plaintiff points to three documents in support of its argument that Defendants have failed to apply a consistent definition of "major population." First, it refers the Court to an August 21, 2000 letter from the Service and the California Department of Fish and Game ("DFG") to the City of San Diego, which defines "major population" as a population with more than 100 individuals. (See Administrative Record ("AR") at 39817-39821.) Second, it cites to a June 25, 2001 letter from the Service to the Corps, which defines "major population" as a population under Corps jurisdiction. (Id. at 39865.)   Third, Plaintiff refers to the 2003

---

3.    Declare the Defendants, by conducting and making findings in its Section 7 consultation, have unlawfully withheld compliance and have acted arbitrary, capricious and unreasonable [sic], within the meaning and requirements of Sections 7(a)(2) and 7(a)(4) and the implementing regulations of the ESA;

4.    Award Plaintiffs their costs, attorneys' fees, and other disbursements for this action, including any expert and witness fees; and

5.    Grant Plaintiffs such other and further relief as this Court may deem just and proper, including retaining jurisdiction pending Defendants' lawful compliance with the ESA as set forth below.

(TAC at 24-25.)

BiOp, which defines "major population" as a population that falls within the geographical boundaries of MSCP "core resource areas." (Id. at 40009.)

Defendants assert these inconsistent definitions are nothing more than "conflicting opinions or equivocal evidence." (Mem. of P. & A. in Supp. of Cross-Motion for Summ. J. at 25) (footnote omitted). They point to other evidence in the record to show that the definition of "major population" in the 2003 BiOp is consistent with the record. First, they refer to an early draft of the San Diego MSCP. This document used the term "focused planning area," which was identified as "extant populations on Otay Mountain and Marron Valley plus additional important populations. (AR at 7268.) Defendants also cite to another document that referred to sixteen "core resource biological areas." (Id. at 7158.) In addition, Defendants refer to several other documents that collectively show that four populations of Willowy monardella would be located in the core resource areas: 4 (Otay Lakes/Otay Mesa/Otay River Valley), 5 (Otay Mountain/Marron Valley), 10 (Mission Trails/Miramar/East Elliott/Santee) and 15 (Vernal Pools, Miramar).

Although the documents cited by Plaintiff indicate some disagreement and apparent confusion within the Service about the definition of "major population," the Court cannot say these documents render the 2003 BiOp arbitrary and capricious. The 2003 BiOp specifically relies on the San Diego MSCP and its definition of "major population." That definition is consistent with the record up to that time. It includes the "focused planning areas" of Otay Mountain and Marron Valley, and corresponds with the "core resource areas" of Otay Lakes, Otay Mesa, Otay River Valley, Mission Trails, Miramar, East Elliott, Santee and Vernal Pools, Miramar. Contrary to Plaintiff's position, the 2003 BiOp provides a discernible and meaningful definition of "major population." That Plaintiff disagrees with that definition, and the resulting exclusion of the Carroll Canyon population therefrom, does not render the 2003 BiOp arbitrary and capricious. See Kandra v. United States, 145 F.Supp.2d 1192, 1210 (D. Or. 2001) (stating existence of disagreement does not render BiOp arbitrary and capricious).

The Court is similarly unpersuaded by Plaintiff's argument that an incidental take statement is required in section 7 analyses for plant species. A plain reading of the statute

reveals that the Act prohibits the "take" of fish or wildlife, but not the "take" of plant species. Compare 16 U.S.C. § 1538(a)(1) with 16 U.S.C. § 1538(a)(2). See also Daniel J. Rohlf, The Endangered Species Act: A Guide to Its Protections and Implementation 71 (1989) (stating "section 9 does not extend its takings proscription to plants.") In the absence of a prohibition on the "take" of plant species, Defendants are correct that "such take cannot occur, and no incidental take statement is needed." (Reply Br. in Supp. of Cross-Motion for Summ. J. at 9.)

Plaintiff's arguments that the take of Willowy monardella is prohibited under sections 9(a)(B) and (E) of the Act does not change the Court's conclusion. Although these sections make it unlawful to remove or reduce endangered plant species "in knowing violation of any law or regulation of any State," 16 U.S.C. § 1538(a)(2)(B), or to "violate any regulation pertaining to such species," 16 U.S.C. § 1538(a)(2)(E), neither of these sections mandates the issuance of an incidental take statement as part of a section 7 analysis.

In light of the above, the Court rejects Plaintiff's arguments that there was a lack of a consistent definition of "major population" in the 2003 BiOp, or that the definition of "major population" was arbitrary and capricious.

### C.   Failure to Use Best Available Scientific Evidence

Next, Plaintiff argues Defendants ignored the best available scientific evidence. It asserts there is available scientific evidence to show that the Willowy monardella protected under the San Diego MSCP is a different species than the Willowy monardella found in Carroll Canyon and other areas. Plaintiff claims Defendants' failure to consider this evidence renders the 2003 BiOp arbitrary and capricious.

The Act requires the Secretary to use "the best scientific and commercial data available" in fulfilling the requirements of section 7 analysis. 16 U.S.C. § 1536(c)(1). See also 50 C.F.R. § 402.14(g)(8) ("In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation.") In the Ninth Circuit, this provision means "an agency cannot ignore available

13

biological information." <u>Kandra</u>, 145 F.Supp.2d at 1208. In <u>Kandra</u>, the court stated, "it is presumed that agencies have used the best data available unless those challenging agency actions can identify relevant data not considered by the agency." 145 F.Supp.2d at 1208.

Here, Plaintiff argues the Service did not consider evidence that the Willowy monardella population in San Diego County may actually consist of two different species. The evidence at the heart of Plaintiff's argument is a study conducted by Mark Elvin. According to the record, Elvin "compared herbarium species from all the populations and compared morphology. They also conducted common greenhouse experiments with all the populations and confirmed that they were morphologically different." (AR at 39936.) Based on this study, Elvin "concluded that the monardella in Otay Mountain, Marone [sic] and Baja is M. Stoneae." (<u>Id.</u>) Defendants assert this information was not the best scientific evidence available, and even if it were, they considered it in reaching their "no jeopardy" determination.

Neither the statute nor its regulations define "best scientific and commercial data available." Defendants argue Elvin's study is simply "unpublished allegations." (Mem. of P. & A. in Supp. of Cross-Motion for Summ. J. at 20.) However, the lack of publication does not render Elvin's study "unavailable," nor have Defendants shown the study was unscientific. Nevertheless, it remains to be seen whether this study was the best evidence for use in conducting the section 7 analysis. As stated by the court in <u>Kandra</u>, an agency "has wide latitude to determine what is 'the best scientific and commercial data available.'" 145 F.Supp.2d at 1208. <u>See also</u> <u>Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency</u>, 11 F.Supp.2d 529, 549 (D.V.I. 1998) (stating agency is "owed deference in selecting the information on which it will rely during consultation.") Although the lack of publication of Elvin's study did not render it "unavailable," the lack of publication and subsequent lack of peer review and comment may have led the Service to conclude that it was not the "best" data to use in the section 7 analysis. In light of the deference afforded to the agency's selection of which information to use in a section 7 analysis, this Court cannot say the Service acted in an arbitrary and capricious manner by not adopting Elvin's conclusions about the taxonomic status of Willowy monardella.

01cv1742

Furthermore, and contrary to Plaintiff's argument, it appears Defendants considered Elvin's study in conducting their section 7 analysis. As Defendants point out, the updated BiOp issued on December 21, 2000 considers this information. It states:

> During the 2000 surveys, morphological differences were observed between the populations of plants in the vicinity of Miramar and the plants in Marron Valley and west Otay Mountain. Preliminary analysis of the data indicates that these plants may be a new subspecies, however this information has not been fully analyzed and published. If it is confirmed that these plants are not Willowy monardella, this consultation may need to be reinitiated to address the status of monardella within the MSCP.

(AR at 38051.) The 2003 BiOp also includes a discussion of this evidence:

> In comparing the morphology of the southern and northern occurrences of willowy monardella, some individuals have asserted that these occurrences represent separate species. (Craig Sherman, *in litt.*, 2003; Mark Elvin, *personal communication*, 2003). However, no peer-reviewed scientific studies supporting this contention have been published to date. Although we were advised earlier this year that a study asserting the southern occurrences constitute a new species is expected to be in press soon (Mark Elvin, *personal communication*, 2003) that information has not yet become available. Nor is the service aware or in possession of any other substantial and reliable scientific information supporting a two taxon connection. If and when new scientific and commercial information on this issue becomes available, the Service will assess its sufficiency, reliability, and credibility, and, if appropriate under 50 CFR § 402.16, we will reinitiate consultation on the Carroll Canyon Business Park project and the City of San Diego's MSCP Subarea Plan.

(Id. at 40000.) Contrary to Plaintiff's assertion, these entries indicate Defendants considered this information in conducting their section 7 analysis. Accordingly, the Court rejects Plaintiff's argument that Defendants ignored the best available scientific evidence in issuing the 2003 BiOp.

**D.    Reliance on Military Conservation Efforts**

Plaintiff's next argument is that the 2003 BiOp is arbitrary and capricious because it relies on the Integrated Natural Resource Management Plan ("INRMP") for Marine Corps Air Station Miramar. Plaintiff asserts the Service cannot rely on this Plan to justify its "no jeopardy" determination. In support of this assertion, Plaintiff cites two cases: Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir. 1987) and Ctr. for Biological Diversity v. Rumsfeld, 198 F.Supp.2d 1139 (D. Ariz. 2001). According to Plaintiff, these cases stand for the proposition

///

15

01cv1742

that the Service may not rely on voluntary actions of third parties in conducting a section 7 analysis.

The Court disagrees with Plaintiff's interpretation of these cases, and finds them to be distinguishable from the present case. In <u>Sierra Club</u>, the third party actions that the Corps relied upon were not voluntary. Rather, they were the subject of a contract between the Corps and the County of San Diego. 816 F.2d at 1380. In contrast, the third party actions in this case are neither voluntary, nor subject to contract, but are part of a statutorily-mandated natural resources management plan. <u>See</u> 16 U.S.C. §§ 670a(a)(1)(A), (B) (stating to facilitate a program to provide for the conservation and rehabilitation of natural resources on military installations, "the Secretary of each military department shall prepare and implement an integrated natural resources management plan[.]")

Furthermore, <u>Sierra Club</u> dealt with whether the Corps was required to reinitiate consultation proceedings with the Service in light of the County's failure to perform under the contract. In contrast, the issue in this case is whether the Service was entitled to rely on the INRMP in conducting its section 7 analysis.

<u>Center for Biological Diversity</u> is similarly distinguishable from the present case. In that case, the Service relied on the Army's future development and implementation of plans to maintain protected species and habitats in rendering a "no jeopardy" opinion." 198 F.Supp.2d at 1146-47. The court held there was no factual or rational basis for this opinion because the mitigation measures were not identified and included in the BiOp. <u>Id.</u> at 1154. In this case, by contrast, the INRMP was finalized and implemented prior to the 2003 BiOp. It sets out specific mitigation measures for natural resource conservation on the military base, and specifically includes the Willowy monardella in its list of special status species.

In the absence of authority to the contrary, the Court finds it was reasonable for the service to rely on the INRMP in issuing its "no jeopardy" opinion. Given that "the majority of the willowy monardella populations and the vast majority of willowy monardella plants located within the northern occurrence" are located on the Miramar base, (AR at 40002), the

///

Court also finds there is a rational connection between the INRMP and the "no jeopardy" determination.

### E.    Association Between Willowy Monardella and Wetlands

Plaintiff's next argument is that Defendants arbitrarily assigned wetland protection to the Willowy monardella. Plaintiff asserts there is no evidence in the record for making this assumption, and no evidence that Willowy monardella is located in jurisdictional wetlands.

Defendants disagree. They cite to a report in the record entitled "Habitat Characteristics of Willowy Monardella, Monardella Linoides ssp. Viminea, in San Diego County," which was prepared by Gerald A. Schein and submitted to Caltrans. This report states:

> In San Diego County, Willowy monardella, in general, occurs along ephemeral streams in various canyons that support a flood disturbance type vegetation. They can be found growing on coarse, rocky, sandy alluvium on floodplains, benches cut from the banks of channels, on stabilized sandbars, along the banks of channels and drainages, and even in the streambed in some locations. Although these locations cover many different types of physical localities they are all similar in certain aspects (eg. soil and overall vegetation). These similarities can be explained in part by reviewing the conditions and processes which lead to their development within the stream system.

(AR at 37195.)

Plaintiff does not dispute the findings in this report. Indeed, it appears Plaintiff would agree with these findings. (See id. at 31119) (stating Willowy monardella "is closely tied to ephemeral watercourses[.]") However, it argues that this general description of Willowy monardella habitat does not amount to a relevant connection with a 33 U.S.C. § 1344 wetland.

Title 23 of the Code of Federal Regulations section 777.2 defines "wetland" or "wetlands" as "those areas that are inundated or saturated by surface or ground water at a frequency and duration to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetland generally include swamps, marshes, bogs and similar areas." 23 C.F.R. § 777.2. It is unclear to this Court whether the description of Willowy monardella habitat set out in the Schein report falls within this definition of "wetland." Based on the statements in the MSCP take permit and the MSCP BiOp, Defendants apparently made that connection, and there is some evidence in the record to support that connection. This Court will not "'substitute its judgment for the

17

agency's particularly in areas which require application of agency expertise.'" Hawksbill Sea Turtle, 11 F.Supp.2d at 542 (quoting Defenders of Wildlife v. Adm'r, Envtl. Protection Agency, 688 F.Supp. 1334, 1352 (D. Minn. 1988)). Accordingly, the Court rejects Plaintiff's argument that Defendants' association of Willowy monardella with wetlands was arbitrary and capricious.

### F.    Accounting Methods

Next, Plaintiff argues that Defendants refused to analyze or determine the status of Willowy monardella in issuing their "no jeopardy" opinion. Plaintiff faults Defendants for failing to reconcile different accounting methods for use in preparing the BiOp and for use in future studies. Defendants argue they are not required to reconcile these differing accounting methods. They also assert they properly evaluated the status of Willowy monardella based on the evidence before them.

The 2003 BiOp states: "It is not possible to reach a statistically valid conclusion regarding the relative abundances of willowy monardella across its distribution because the methods to estimate population sizes have differed among surveyors, jurisdictional ownership, and years." (AR at 40002.) Plaintiff seizes upon this statement as proof that Defendants failed to determine the status of Willowy monardella. However, the 2003 BiOp, as a whole, reveals otherwise. Table 4 of the BiOp "summarizes available estimates of population sizes using plants, occurrences, clumps, and/or colonies as population metrics." (Id.) This Table lists the number of occurrences of Willowy monardella in each core resource area of the MSCP based on surveys conducted prior to 2000, in 2000, in 2001 and in 2002. (Id. at 40002-04.) The BiOp then analyzes the data in the Table, and concludes:

> [t]here is no reliable scientific evidence to indicate that the species is in decline. While the year to year data indicates a few of the smaller populations may have declined, other data show substantial increases in other larger populations, such as those on MCAS Miramar. Thus, it does not appear that the baseline for this species has eroded since its listing and in fact discovery of a new large population on Otay Mountain on BLM land appears to have improved the baseline status of the species.

(Id. at 40012-13.) Contrary to Plaintiff's argument, this discussion and conclusion is not arbitrary and capricious.

Plaintiff's assertion that Defendants should have reconciled the differing accounting methods prior to issuing the BiOp and for purposes of future surveys is similarly unconvincing. In Southwest Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58 (9th Cir. 2000), the Ninth Circuit clearly stated that "the 'best available data' requirement makes it clear that the Secretary has no obligation to conduct independent studies." Id. at 60. In that case, the district court bypassed the critical inquiry, which was whether the best available data required the Service to list a species as threatened or endangered, and proceeded to determine whether the data available to the Service at the time it made its listing determination was "good enough." Id. at 59. The Ninth Circuit reversed that decision, stating "the District Court was without authority to order the Secretary to conduct an independent population count of the birds." Id. Similarly, this Court is without jurisdiction to order Defendants to conduct a count of Willowy monardella that reconciles the different accounting methods used in the past. The only issue for this Court is whether the Defendants' "no jeopardy" decision is arbitrary and capricious. In light of the survey information included in the 2003 BiOp, and the analysis and discussion thereof, this Court cannot say there is no rational connection between the data and Defendants' conclusion that Willowy monardella are not in decline.

G.    **Cumulative Effects Analysis**

Plaintiff's final argument is that Defendants refused to conduct a cumulative effects analysis thereby rendering the 2003 BiOp arbitrary and capricious. The record, however, contradicts Plaintiff's argument. Under the heading, "Cumulative Effects," the 2003 BiOp states:

> Cumulative effects include the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal Actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.
>
> Because willowy monardella occurs in association with Corps jurisdictional waters or on MCAS Miramar, most development should have a federal nexus and therefore is not considered a cumulative effect under Section 7. Willowy monardella does continue to be affected by invasion of exotics and changes in hydrology due to existing development surrounding some populations. In addition, those populations occurring adjacent to the border may be impacted by illegal immigrants due to accidental fires, foot traffic, and border patrol's

19

intervention. These impacts could damage or kill individual plants and/or entire populations.

(AR at 40014.) Based on this discussion, the Court rejects Plaintiff's assertion that Defendants failed to conduct a cumulative effects analysis in this case. The only other issue, therefore, is whether the cumulative effects analysis is arbitrary and capricious. Plaintiff fails to provide any convincing arguments on this point.

## VI.

## CONCLUSION AND ORDER

For all the foregoing reasons, the Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendants' Cross-Motion for Summary Judgment [Doc. Nos. 50 and 60].

**IT IS SO ORDERED.**

DATED:___2-9-04___

_____
DANA M. SABRAW
United States District Court

cc:    Judge Adler
       All Parties

20

01cv1742